## ASHCROFT, ATTORNEY GENERAL *v.* AMERICAN CIVIL LIBERTIES UNION ET AL.

No. 00–1293.   Argued November 28, 2001—Decided May 13, 2002

*Solicitor General Olson* argued the cause for petitioner. With him on the briefs were *Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Irving L. Gornstein, Barbara L. Herwig, Jacob M. Lewis,* and *Charles Scarborough.*

*Ann E. Beeson* argued the cause for respondents. With her on the briefs were *Christopher A. Hansen, Steven R. Shapiro, Stefan Presser, David L. Sobel, Alexandra A. E. Shapiro,* and *Christopher R. Harris.**

---

*Briefs of *amici curiae* urging reversal were filed for the County of DuPage by *Richard Hodyl, Jr., Joseph E. Birkett,* and *Nancy J. Wolfe;* for the American Center for Law and Justice by *Jay Alan Sekulow, James M. Henderson, Sr., Colby M. May,* and *Walter M. Weber;* for Morality in Media, Inc., et al. by *Paul J. McGeady, Robin S. Whitehead,* and *Janet M. LaRue;* for Wallbuilders, Inc., by *Barry C. Hodge;* for Senator John S. McCain et al. by *Bruce A. Taylor;* and for Senator Raymond N. Haynes et al. by *Richard D. Ackerman* and *Gary G. Kreep.*

Briefs of *amici curiae* urging affirmance were filed for the American Society of Journalists and Authors et al. by *Carl A. Solano, Theresa E. Loscalzo, Jennifer DuFault James, Joseph T. Lukens,* and *Dionna K. Litvin;* for the Association of National Advertisers, Inc., by *Steven G. Brody*

JUSTICE THOMAS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, an opinion with respect to Parts III–A, III–C, and III–D, in which THE CHIEF JUSTICE and JUSTICE SCALIA join, and an opinion with respect to Part III–B, in which THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join.

This case presents the narrow question whether the Child Online Protection Act's (COPA or Act) use of "community standards" to identify "material that is harmful to minors" violates the First Amendment. We hold that this aspect of COPA does not render the statute facially unconstitutional.

## I

"The Internet . . . offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U. S. C. § 230(a)(3) (1994 ed., Supp. V). While "surfing" the World Wide Web, the primary method of remote information retrieval on the Internet today,[1] see App. in No. 99–1324 (CA3), p. 180 (hereinafter App.), individuals can access material about topics ranging from aardvarks to Zoroastrianism. One can use the Web to read thousands of newspapers published around the globe, purchase tickets for a matinee at the neighborhood movie theater, or follow the progress of any Major League Baseball team on a pitch-by-pitch basis.

The Web also contains a wide array of sexually explicit material, including hardcore pornography. See, e. g., Amer-

---

and *Gilbert H. Weil;* for the Association of American Publishers, Inc., et al. by *R. Bruce Rich* and *Jonathan Bloom;* for the Chamber of Commerce of the United States by *Jodie L. Kelley, Paul M. Smith,* and *Robert Corn-Revere;* for the Society for the Scientific Study of Sexuality et al. by *Marjorie Heins* and *Joan E. Bertin;* and for Volunteer Lawyers for the Arts et al. by *Charles L. Kerr, Elliot M. Mincberg,* and *Lawrence S. Ottinger.*

[1] For a thorough explanation of the history, structure, and operation of the Internet and World Wide Web, see *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 849–853 (1997).

*ican Civil Liberties Union* v. *Reno*, 31 F. Supp. 2d 473, 484 (ED Pa. 1999). In 1998, for instance, there were approximately 28,000 adult sites promoting pornography on the Web. See H. R. Rep. No. 105-775, p. 7 (1998). Because "[n]avigating the Web is relatively straightforward," *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 852 (1997), and access to the Internet is widely available in homes, schools, and libraries across the country,[2] see App. 177–178, children may discover this pornographic material either by deliberately accessing pornographic Web sites or by stumbling upon them. See 31 F. Supp. 2d, at 476 ("A child with minimal knowledge of a computer, the ability to operate a browser, and the skill to type a few simple words may be able to access sexual images and content over the World Wide Web").

Congress first attempted to protect children from exposure to pornographic material on the Internet by enacting the Communications Decency Act of 1996 (CDA), 110 Stat. 133. The CDA prohibited the knowing transmission over the Internet of obscene or indecent messages to any recipient under 18 years of age. See 47 U. S. C. § 223(a). It also forbade any individual from knowingly sending over or displaying on the Internet certain "patently offensive" material in a manner available to persons under 18 years of age. See § 223(d). The prohibition specifically extended to "any comment, request, suggestion, proposal, image, or other communication that, in context, depict[ed] or describ[ed], in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." § 223(d)(1).

---

[2] When this litigation commenced in 1998, "[a]pproximately 70.2 million people of all ages use[d] the Internet in the United States." App. 171. It is now estimated that 115.2 million Americans use the Internet at least once a month and 176.5 million Americans have Internet access either at home or at work. See More Americans Online, New York Times, Nov. 19, 2001, p. C7.

The CDA provided two affirmative defenses to those prosecuted under the statute. The first protected individuals who took "good faith, reasonable, effective, and appropriate actions" to restrict minors from accessing obscene, indecent, and patently offensive material over the Internet. See § 223(e)(5)(A). The second shielded those who restricted minors from accessing such material "by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number." § 223(e)(5)(B).

Notwithstanding these affirmative defenses, in *Reno* v. *American Civil Liberties Union*, we held that the CDA's regulation of indecent transmissions, see § 223(a), and the display of patently offensive material, see § 223(d), ran afoul of the First Amendment. We concluded that "the CDA lack[ed] the precision that the First Amendment requires when a statute regulates the content of speech" because, "[i]n order to deny minors access to potentially harmful speech, the CDA effectively suppress[ed] a large amount of speech that adults ha[d] a constitutional right to receive and to address to one another." 521 U. S., at 874.

Our holding was based on three crucial considerations. First, "existing technology did not include any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to adults." *Id.*, at 876. Second, "[t]he breadth of the CDA's coverage [was] wholly unprecedented." *Id.*, at 877. "Its open-ended prohibitions embrace[d]," not only commercial speech or commercial entities, but also "all nonprofit entities and individuals posting indecent messages or displaying them on their own computers in the presence of minors." *Ibid.* In addition, because the CDA did not define the terms "indecent" and "patently offensive," the statute "cover[ed] large amounts of nonpornographic material with serious educational or other value." *Ibid.* As a result, regulated subject matter under the CDA extended to "discussions about prison rape or safe sexual practices, artistic images that include nude subjects, and arguably the card

catalog of the Carnegie Library." *Id.*, at 878. Third, we found that neither affirmative defense set forth in the CDA "constitute[d] the sort of 'narrow tailoring' that [would] save an otherwise patently invalid unconstitutional provision." *Id.*, at 882. Consequently, only the CDA's ban on the knowing transmission of obscene messages survived scrutiny because obscene speech enjoys no First Amendment protection. See *id.*, at 883.

After our decision in *Reno* v. *American Civil Liberties Union*, Congress explored other avenues for restricting minors' access to pornographic material on the Internet. In particular, Congress passed and the President signed into law the Child Online Protection Act, 112 Stat. 2681–736 (codified in 47 U. S. C. § 231 (1994 ed., Supp. V)). COPA prohibits any person from "knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, mak[ing] any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors." 47 U. S. C. § 231(a)(1).

Apparently responding to our objections to the breadth of the CDA's coverage, Congress limited the scope of COPA's coverage in at least three ways. First, while the CDA applied to communications over the Internet as a whole, including, for example, e-mail messages, COPA applies only to material displayed on the World Wide Web. Second, unlike the CDA, COPA covers only communications made "for commercial purposes."[3] *Ibid.* And third, while the CDA pro-

---

[3] The statute provides that "[a] person shall be considered to make a communication for commercial purposes only if such person is engaged in the business of making such communications." 47 U. S. C. § 231(e)(2)(A) (1994 ed., Supp. V). COPA then defines the term "engaged in the business" to mean a person:

"who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the

hibited "indecent" and "patently offensive" communications, COPA restricts only the narrower category of "material that is harmful to minors." *Ibid.*

Drawing on the three-part test for obscenity set forth in *Miller* v. *California,* 413 U.S. 15 (1973), COPA defines "material that is harmful to minors" as

"any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

"(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

"(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

"(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." 47 U.S.C. § 231(e)(6).

Like the CDA, COPA also provides affirmative defenses to those subject to prosecution under the statute. An individual may qualify for a defense if he, "in good faith, has restricted access by minors to material that is harmful to minors—(A) by requiring the use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." § 231(c)(1). Persons violating COPA are subject to both civil and criminal sanctions. A civil penalty of up to $50,000 may be imposed for each violation of

person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income)." § 231(e)(2)(B).

the statute. Criminal penalties consist of up to six months in prison and/or a maximum fine of $50,000. An additional fine of $50,000 may be imposed for any intentional violation of the statute. § 231(a).

One month before COPA was scheduled to go into effect, respondents filed a lawsuit challenging the constitutionality of the statute in the United States District Court for the Eastern District of Pennsylvania. Respondents are a diverse group of organizations,[4] most of which maintain their own Web sites. While the vast majority of content on their Web sites is available for free, respondents all derive income from their sites. Some, for example, sell advertising that is displayed on their Web sites, while others either sell goods directly over their sites or charge artists for the privilege of posting material. 31 F. Supp. 2d, at 487. All respondents either post or have members that post sexually oriented material on the Web. *Id.*, at 480. Respondents' Web sites contain "resources on obstetrics, gynecology, and sexual health; visual art and poetry; resources designed for gays and lesbians; information about books and stock photographic images offered for sale; and online magazines." *Id.*, at 484.

In their complaint, respondents alleged that, although they believed that the material on their Web sites was valuable for adults, they feared that they would be prosecuted under COPA because some of that material "could be construed as 'harmful to minors' in some communities." App. 63. Respondents' facial challenge claimed, *inter alia*, that COPA violated adults' rights under the First and Fifth Amend-

---

[4] Respondents include the American Civil Liberties Union, Androgony Books, Inc., d/b/a A Different Light Bookstores, the American Booksellers Foundation for Free Expression, Artnet Worldwide Corporation, BlackStripe, Addazi Inc. d/b/a Condomania, the Electronic Frontier Foundation, the Electronic Privacy Information Center, Free Speech Media, OBGYN.net, Philadelphia Gay News, PlanetOut Corporation, Powell's Bookstore, Riotgrrl, Salon Internet, Inc., and West Stock, Inc., now known as ImageState North America, Inc.

ments because it (1) "create[d] an effective ban on constitutionally protected speech by and to adults"; (2) "[was] not the least restrictive means of accomplishing any compelling governmental purpose"; and (3) "[was] substantially overbroad."[5] *Id.*, at 100–101.

The District Court granted respondents' motion for a preliminary injunction, barring the Government from enforcing the Act until the merits of respondents' claims could be adjudicated. 31 F. Supp. 2d, at 499. Focusing on respondents' claim that COPA abridged the free speech rights of adults, the District Court concluded that respondents had established a likelihood of success on the merits. *Id.*, at 498. The District Court reasoned that because COPA constitutes content-based regulation of sexual expression protected by the First Amendment, the statute, under this Court's precedents, was "presumptively invalid" and "subject to strict scrutiny." *Id.*, at 493. The District Court then held that respondents were likely to establish at trial that COPA could not withstand such scrutiny because, among other reasons, it was not apparent that COPA was the least restrictive means of preventing minors from accessing "harmful to minors" material. *Id.*, at 497.

The Attorney General of the United States appealed the District Court's ruling. *American Civil Liberties Union* v. *Reno*, 217 F. 3d 162 (CA3 2000). The United States Court of Appeals for the Third Circuit affirmed. Rather than reviewing the District Court's "holding that COPA was not likely to succeed in surviving strict scrutiny analysis," the Court of Appeals based its decision entirely on a ground that was not relied upon below and that was "virtually ignored by the parties and the amicus in their respective briefs." *Id.*, at 173–174. The Court of Appeals concluded that

---

[5] In three other claims, which are not relevant to resolving the dispute at hand, respondents alleged that COPA infringed the free speech rights of older minors, violated the right to "communicate and access information anonymously," and was "unconstitutionally vague." App. 101–102.

COPA's use of "contemporary community standards" to identify material that is harmful to minors rendered the statute substantially overbroad. Because "Web publishers are without any means to limit access to their sites based on the geographic location of particular Internet users," the Court of Appeals reasoned that COPA would require "any material that might be deemed harmful by the most puritan of communities in any state" to be placed behind an age or credit card verification system. *Id.*, at 175. Hypothesizing that this step would require Web publishers to shield "vast amounts of material," *ibid.*, the Court of Appeals was "persuaded that this aspect of COPA, without reference to its other provisions, must lead inexorably to a holding of a likelihood of unconstitutionality of the entire COPA statute," *id.*, at 174.

We granted the Attorney General's petition for certiorari, 532 U. S. 1037 (2001), to review the Court of Appeals' determination that COPA likely violates the First Amendment because it relies, in part, on community standards to identify material that is harmful to minors, and now vacate the Court of Appeals' judgment.

## II

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." This provision embodies "[o]ur profound national commitment to the free exchange of ideas." *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U. S. 657, 686 (1989). "[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65 (1983) (quoting *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972)). However, this principle, like other First Amendment principles, is not absolute. Cf. *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 56 (1988).

Obscene speech, for example, has long been held to fall outside the purview of the First Amendment. See, *e. g.,* *Roth* v. *United States,* 354 U. S. 476, 484–485 (1957). But this Court struggled in the past to define obscenity in a manner that did not impose an impermissible burden on protected speech. See *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676, 704 (1968) (Harlan, J., concurring in part and dissenting in part) (referring to the "intractable obscenity problem"); see also *Miller* v. *California,* 413 U. S., at 20–23 (reviewing "the somewhat tortured history of th[is] Court's obscenity decisions"). The difficulty resulted from the belief that "in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression." *Id.,* at 22–23.

Ending over a decade of turmoil, this Court in *Miller* set forth the governing three-part test for assessing whether material is obscene and thus unprotected by the First Amendment: "(a) [W]hether 'the average person, *applying contemporary community standards*' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.,* at 24 (citations omitted; emphasis added).

*Miller* adopted the use of "community standards" from *Roth,* which repudiated an earlier approach for assessing objectionable material. Beginning in the 19th century, English courts and some American courts allowed material to be evaluated from the perspective of particularly sensitive persons. See, *e. g., Queen* v. *Hicklin* [1868] L. R. 3 Q. B. 360; see also *Roth,* 354 U. S., at 488–489, and n. 25 (listing relevant cases). But in *Roth,* this Court held that this sensitive person standard was "unconstitutionally restrictive of

the freedoms of speech and press" and approved a standard requiring that material be judged from the perspective of "the average person, applying contemporary community standards." *Id.*, at 489. The Court preserved the use of community standards in formulating the *Miller* test, explaining that they furnish a valuable First Amendment safeguard: "[T]he primary concern . . . is to be certain that . . . [material] will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Miller, supra,* at 33 (internal quotation marks omitted); see also *Hamling* v. *United States,* 418 U. S. 87, 107 (1974) (emphasizing that the principal purpose of the community standards criterion "is to assure that the material is judged neither on the basis of each juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group").

## III

The Court of Appeals, however, concluded that this Court's prior community standards jurisprudence "has no applicability to the Internet and the Web" because "Web publishers are currently without the ability to control the geographic scope of the recipients of their communications." 217 F. 3d, at 180. We therefore must decide whether this technological limitation renders COPA's reliance on community standards constitutionally infirm.[6]

---

[6] While petitioner contends that a speaker on the Web possesses the ability to communicate only with individuals located in targeted geographic communities, Brief for Petitioner 29, n. 3, he stipulated below that "[o]nce a provider posts its content on the Internet and chooses to make it available to all, it generally cannot prevent that content from entering any geographic community." App. 187. The District Court adopted this stipulation as a finding of fact, see *American Civil Liberties Union* v. *Reno,* 31 F. Supp. 2d 473, 484 (ED Pa. 1999), and petitioner points to no evidence in the record suggesting that this finding is clearly erroneous.

## A

In addressing this question, the parties first dispute the nature of the community standards that jurors will be instructed to apply when assessing, in prosecutions under COPA, whether works appeal to the prurient interest of minors and are patently offensive with respect to minors.[7] Respondents contend that jurors will evaluate material using "local community standards," Brief for Respondents 40, while petitioner maintains that jurors will not consider the community standards of any particular geographic area, but rather will be "instructed to consider the standards of the adult community as a whole, without geographic specification." Brief for Petitioner 38.

In the context of this case, which involves a facial challenge to a statute that has never been enforced, we do not think it prudent to engage in speculation as to whether certain hypothetical jury instructions would or would not be consistent with COPA, and deciding this case does not require us to do so. It is sufficient to note that community standards need not be defined by reference to a precise geographic area. See *Jenkins* v. *Georgia*, 418 U. S. 153, 157 (1974) ("A State may choose to define an obscenity offense in terms of 'contemporary community standards' as defined in *Miller* without further specification . . . or it may choose to define the standards in more precise geographic terms, as was done by California in *Miller*"). Absent geographic

---

[7] Although the phrase "contemporary community standards" appears only in the "prurient interest" prong of the *Miller* test, see *Miller* v. *California*, 413 U. S. 15, 24 (1973), this Court has indicated that the "patently offensive" prong of the test is also a question of fact to be decided by a jury applying contemporary community standards. See, *e. g., Pope* v. *Illinois*, 481 U. S. 497, 500 (1987). The parties here therefore agree that even though "contemporary community standards" are similarly mentioned only in the "prurient interest" prong of COPA's harmful-to-minors definition, see 47 U. S. C. § 231(e)(6)(A), jurors will apply "contemporary community standards" as well in evaluating whether material is "patently offensive with respect to minors," § 231(e)(6)(B).

specification, a juror applying community standards will inevitably draw upon personal "knowledge of the community or vicinage from which he comes." *Hamling, supra,* at 105. Petitioner concedes the latter point, see Reply Brief for Petitioner 3–4, and admits that, even if jurors were instructed under COPA to apply the standards of the adult population as a whole, the variance in community standards across the country could still cause juries in different locations to reach inconsistent conclusions as to whether a particular work is "harmful to minors." Brief for Petitioner 39.

## B

Because juries would apply different standards across the country, and Web publishers currently lack the ability to limit access to their sites on a geographic basis, the Court of Appeals feared that COPA's "community standards" component would effectively force all speakers on the Web to abide by the "most puritan" community's standards. 217 F. 3d, at 175. And such a requirement, the Court of Appeals concluded, "imposes an overreaching burden and restriction on constitutionally protected speech." *Id.,* at 177.

In evaluating the constitutionality of the CDA, this Court expressed a similar concern over that statute's use of community standards to identify patently offensive material on the Internet. We noted that "the 'community standards' criterion as applied to the Internet means that any communication available to a nationwide audience will be judged by the standards of the community most likely to be offended by the message." *Reno,* 521 U. S., at 877–878. The Court of Appeals below relied heavily on this observation, stating that it was "not persuaded that the Supreme Court's concern with respect to the 'community standards' criterion has been sufficiently remedied by Congress in COPA." 217 F. 3d, at 174.

The CDA's use of community standards to identify patently offensive material, however, was particularly problem-

atic in light of that statute's unprecedented breadth and vagueness. The statute covered communications depicting or describing "sexual or excretory activities or organs" that were "patently offensive as measured by contemporary community standards"—a standard somewhat similar to the second prong of *Miller*'s three-prong test. But the CDA did not include any limiting terms resembling *Miller*'s additional two prongs. See *Reno*, 521 U. S., at 873. It neither contained any requirement that restricted material appeal to the prurient interest nor excluded from the scope of its coverage works with serious literary, artistic, political, or scientific value. *Ibid.* The tremendous breadth of the CDA magnified the impact caused by differences in community standards across the country, restricting Web publishers from openly displaying a significant amount of material that would have constituted protected speech in some communities across the country but run afoul of community standards in others.

COPA, by contrast, does not appear to suffer from the same flaw because it applies to significantly less material than did the CDA and defines the harmful-to-minors material restricted by the statute in a manner parallel to the *Miller* definition of obscenity. See *supra*, at 569–570, 574–575. To fall within the scope of COPA, works must not only "depic[t], describ[e], or represen[t], in a manner patently offensive with respect to minors," particular sexual acts or parts of the anatomy,[8] they must also be designed to appeal to the prurient interest of minors and, "taken as a whole, lac[k] serious

---

[8] While the CDA allowed juries to find material to be patently offensive so long as it depicted or described "sexual or excretory activities or organs," COPA specifically delineates the sexual activities and anatomical features, the depictions of which may be found to be patently offensive: "an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast." 47 U. S. C. § 231(e)(6)(B).

literary, artistic, political, or scientific value for minors." 47 U. S. C. § 231(e)(6).

These additional two restrictions substantially limit the amount of material covered by the statute. Material appeals to the prurient interest, for instance, only if it is in some sense erotic. Cf. *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 213, and n. 10 (1975).[9] Of even more significance, however, is COPA's exclusion of material with serious value for minors. See 47 U. S. C. § 231(e)(6)(C). In *Reno*, we emphasized that the serious value "requirement is particularly important because, unlike the 'patently offensive' and 'prurient interest' criteria, it is not judged by contemporary community standards." 521 U. S., at 873 (citing *Pope* v. *Illinois*, 481 U. S. 497, 500 (1987)). This is because "the value of [a] work [does not] vary from community to community based on the degree of local acceptance it has won." *Ibid.* Rather, the relevant question is "whether a reasonable person would find . . . value in the material, taken as a whole." *Id.*, at 501. Thus, the serious value requirement "allows appellate courts to impose some limitations and regularity on the definition by setting, *as a matter of law*, a national floor for socially redeeming value." *Reno, supra*, at 873 (emphasis added), a safeguard nowhere present in the CDA.[10]

---

[9] JUSTICE STEVENS argues that the "prurient interest" prong does not "substantially narrow the category of images covered" by COPA because "[a]rguably every depiction of nudity—partial or full—is in some sense erotic *with respect to minors*," *post*, at 607–608 (dissenting opinion) (emphasis in original). We do not agree. For example, we have great difficulty understanding how pictures of a war victim's wounded nude body could reasonably be described under the vast majority of circumstances as erotic, especially when evaluated from the perspective of minors. See Webster's Ninth New Collegiate Dictionary 422 (1991) (defining erotic as "of, devoted to, or tending to arouse sexual love or desire").

[10] JUSTICE STEVENS contends that COPA's serious value prong only marginally limits the sweep of the statute because it does not protect all material with serious value but just those works with serious value *for minors*. See *post*, at 608. His dissenting opinion, however, does not refer to any evidence supporting this counterintuitive assertion, and there

## C

When the scope of an obscenity statute's coverage is sufficiently narrowed by a "serious value" prong and a "prurient interest" prong, we have held that requiring a speaker disseminating material to a national audience to observe varying community standards does not violate the First Amendment. In *Hamling* v. *United States*, 418 U. S. 87 (1974), this Court considered the constitutionality of applying community standards to the determination of whether material is obscene under 18 U. S. C. § 1461, the federal statute prohibiting the mailing of obscene material. Although this statute does not define obscenity, the petitioners in *Hamling* were tried and convicted under the definition of obscenity set forth in *Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Mass.*, 383 U. S. 413 (1966), which included both a "prurient interest" requirement and a requirement that prohibited material be " 'utterly without redeeming social value.' " *Hamling, supra*, at 99 (quoting *Memoirs, supra*, at 418).

Like respondents here, the dissenting opinion in *Hamling* argued that it was unconstitutional for a federal statute to rely on community standards to regulate speech. Justice Brennan maintained that "[n]ational distributors choosing to send their products in interstate travels [would] be forced to cope with the community standards of every hamlet into which their goods [might] wander." 418 U. S., at 144. As a result, he claimed that the inevitable result of this situation would be "debilitating self-censorship that abridges the First Amendment rights of the people." *Ibid.*

This Court, however, rejected Justice Brennan's argument that the federal mail statute unconstitutionally compelled

---

is certainly none in the record suggesting that COPA restricts about the same amount of material as did the CDA. Moreover, JUSTICE STEVENS does not dispute that COPA's "serious value" prong serves the important purpose of allowing appellate courts to set "as a matter of law, a national floor for socially redeeming value." *Reno*, 521 U. S., at 873.

speakers choosing to distribute materials on a national basis to tailor their messages to the least tolerant community: "The fact that distributors of allegedly obscene materials may be subjected to varying community standards in the various federal judicial districts into which they transmit the materials does not render a federal statute unconstitutional." *Id.*, at 106.

Fifteen years later, *Hamling's* holding was reaffirmed in *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115 (1989). *Sable* addressed the constitutionality of 47 U. S. C. § 223(b) (1982 ed., Supp. V), a statutory provision prohibiting the use of telephones to make obscene or indecent communications for commercial purposes. The petitioner in that case, a "dial-a-porn" operator, challenged, in part, that portion of the statute banning obscene phone messages. Like respondents here, the "dial-a-porn" operator argued that reliance on community standards to identify obscene material impermissibly compelled "message senders . . . to tailor all their messages to the least tolerant community." 492 U. S., at 124.[11] Relying on *Hamling*, however, this Court once again rebuffed this attack on the use of community standards in a federal statute of national scope: "There is no constitutional barrier under *Miller* to prohibiting communications that are obscene in some communities under local standards even though they are not obscene in others. *If Sable's audience is comprised of different communities with different local standards, Sable ultimately bears the burden of complying with the prohibition on obscene messages.*" 492 U. S., at 125–126 (emphasis added).

The Court of Appeals below concluded that *Hamling* and *Sable* "are easily distinguished from the present case" because in both of those cases "the defendants had the ability

---

[11] Although nowhere mentioned in the relevant statutory text, this Court has held that the *Miller* test defines regulated speech for purposes of federal obscenity statutes such as 47 U. S. C. § 223(b) (1994 ed.). See, *e. g., Smith* v. *United States*, 431 U. S. 291, 299 (1977).

to control the distribution of controversial material with respect to the geographic communities into which they released it" whereas "Web publishers have no such comparable control." 217 F. 3d, at 175–176. In neither *Hamling* nor *Sable,* however, was the speaker's ability to target the release of material into particular geographic areas integral to the legal analysis. In *Hamling,* the ability to limit the distribution of material to targeted communities was not mentioned, let alone relied upon,[12] and in *Sable,* a dial-a-porn operator's ability to screen incoming calls from particular areas was referenced only as a supplemental point, see 492 U. S., at 125.[13] In the latter case, this Court made no effort to evaluate how burdensome it would have been for dial-a-porn operators to tailor their messages to callers from thousands of different communities across the Nation, instead concluding that the burden of complying with the statute rested with those companies. See *id.,* at 126.

---

[12] This fact was perhaps omitted because under the federal statute at issue in *Hamling* v. *United States,* 418 U. S. 87 (1974), a defendant could be prosecuted in any district through which obscene mail passed while it was on route to its destination, see *id.,* at 143–144 (Brennan, J., dissenting), and a postal customer obviously lacked the ability to control the path his letter traveled as it made its way to its intended recipient.

[13] JUSTICE STEVENS' contention that this Court "upheld the application of community standards to a nationwide medium" in *Sable* due to the fact that "[it] was at least possible" for dial-a-porn operators to tailor their messages to particular communities is inaccurate. See *post,* at 605 (dissenting opinion). This Court's conclusion clearly did not hinge either on the fact that dial-a-porn operators could prevent callers in particular communities from accessing their messages or on an assessment of how burdensome it would have been for dial-a-porn operators to take that step. Rather, these companies were required to abide by the standards of various communities for the sole reason that they transmitted their material into those communities. See *Sable,* 492 U. S., at 126 ("If Sable's audience is comprised of different communities with different local standards, Sable ultimately bears the burden of complying with the prohibition on obscene messages").

While JUSTICE KENNEDY and JUSTICE STEVENS question the applicability of this Court's community standards jurisprudence to the Internet, we do not believe that the medium's "unique characteristics" justify adopting a different approach than that set forth in *Hamling* and *Sable*. See *post*, at 594–595 (KENNEDY, J., concurring in judgment). If a publisher chooses to send its material into a particular community, this Court's jurisprudence teaches that it is the publisher's responsibility to abide by that community's standards. The publisher's burden does not change simply because it decides to distribute its material to every community in the Nation. See *Sable, supra*, at 125–126. Nor does it change because the publisher may wish to speak only to those in a "community where avant garde culture is the norm," *post*, at 595 (KENNEDY, J., concurring in judgment), but nonetheless utilizes a medium that transmits its speech from coast to coast. If a publisher wishes for its material to be judged only by the standards of particular communities, then it need only take the simple step of utilizing a medium that enables it to target the release of its material into those communities.[14]

Respondents offer no other grounds upon which to distinguish this case from *Hamling* and *Sable*. While those cases involved obscenity rather than material that is harmful to minors, we have no reason to believe that the practical effect of varying community standards under COPA, given the statute's definition of "material that is harmful to minors," is significantly greater than the practical effect of varying

---

[14] In addition, COPA does not, as JUSTICE KENNEDY suggests, "'foreclose an entire medium of expression.'" *Post*, at 596 (quoting *City of Ladue* v. *Gilleo*, 512 U. S. 43, 55 (1994)). While JUSTICE KENNEDY and JUSTICE STEVENS repeatedly imply that COPA banishes from the Web material deemed harmful to minors by reference to community standards, see, *e. g., post*, at 596 (opinion concurring in judgment); *post*, at 608–609, 612 (dissenting opinion), the statute does no such thing. It only requires that such material be placed behind adult identification screens.

community standards under federal obscenity statutes. It is noteworthy, for example, that respondents fail to point out even a single exhibit in the record as to which coverage under COPA would depend upon which community in the country evaluated the material. As a result, if we were to hold COPA unconstitutional *because of* its use of community standards, federal obscenity statutes would likely also be unconstitutional as applied to the Web,[15] a result in substantial tension with our prior suggestion that the application of the CDA to obscene speech was constitutional. See *Reno,* 521 U. S., at 877, n. 44, 882–883.

## D

Respondents argue that COPA is "unconstitutionally overbroad" because it will require Web publishers to shield some material behind age verification screens that could be displayed openly in many communities across the Nation if Web speakers were able to limit access to their sites on a geographic basis. Brief for Respondents 33–34. "[T]o prevail in a facial challenge," however, "it is not enough for a plaintiff to show 'some' overbreadth." *Reno, supra,* at 896 (O'CONNOR, J., concurring in judgment in part and dissenting in part). Rather, "the overbreadth of a statute must not only be real, but substantial as well." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 615 (1973). At this stage of the litigation, respondents have failed to satisfy this burden, at least solely as a result of COPA's reliance on community standards.[16] Because Congress has narrowed the range of con-

---

[15] Obscene material, for instance, explicitly falls within the coverage of COPA. See 47 U. S. C. §231(e)(6) (1994 ed., Supp. V).

[16] JUSTICE STEVENS' conclusion to the contrary is based on little more than "speculation." See, *e. g., post,* at 598 (KENNEDY, J., concurring in judgment). The only objective evidence cited in the dissenting opinion for the proposition that COPA "will restrict a substantial amount of protected speech that would not be considered harmful to minors in many communities" are various anecdotes compiled in an *amici* brief. See *post,* at 611, and n. 7 (citing Brief for Volunteer Lawyers for the Arts et al. as *Amici*

tent restricted by COPA in a manner analogous to *Miller*'s definition of obscenity, we conclude, consistent with our holdings in *Hamling* and *Sable*, that any variance caused by the statute's reliance on community standards is not substantial enough to violate the First Amendment.

## IV

The scope of our decision today is quite limited. We hold only that COPA's reliance on community standards to identify "material that is harmful to minors" does not *by itself* render the statute substantially overbroad for purposes of the First Amendment. We do not express any view as to whether COPA suffers from substantial overbreadth for other reasons, whether the statute is unconstitutionally vague, or whether the District Court correctly concluded that the statute likely will not survive strict scrutiny analy-

---

*Curiae* 4–10). JUSTICE STEVENS, however, is not even willing to represent that these anecdotes relate to material restricted under COPA, see *post*, at 611, and we understand his reluctance for the vast majority of the works cited in that brief, if not all of them, are likely unaffected by the statute. See Brief for Volunteer Lawyer for the Arts et al. as *Amici Curiae* 4–10 (describing, among other incidents, controversies in various communities regarding Maya Angelou's I Know Why The Caged Bird Sings, Judy Blume's Are You There God? It's Me, Margaret, Aldous Huxley's Brave New World, J. D. Salinger's Catcher in the Rye, 1993 Academy Award Best Picture nominee The Piano, the American Broadcasting Corporation television network's NYPD Blue, and songs of the "popular folk-rock duo" the Indigo Girls). These anecdotes are therefore of questionable relevance to the matter at hand and certainly do not constitute a sufficient basis for invalidating a federal statute.

Moreover, we do not agree with JUSTICE KENNEDY's suggestion that it is necessary for the Court of Appeals to revisit this question upon remand. See *post*, at 597–599. The lack of evidence in the record relevant to the question presented does not indicate that "we should vacate for further consideration." *Post*, at 599. Rather, it indicates that respondents, by offering little more than "speculation," have failed to meet their burden of demonstrating in this facial challenge that COPA's reliance on community standards renders the statute substantially overbroad.

sis once adjudication of the case is completed below. While respondents urge us to resolve these questions at this time, prudence dictates allowing the Court of Appeals to first examine these difficult issues.

Petitioner does not ask us to vacate the preliminary injunction entered by the District Court, and in any event, we could not do so without addressing matters yet to be considered by the Court of Appeals. As a result, the Government remains enjoined from enforcing COPA absent further action by the Court of Appeals or the District Court.

For the foregoing reasons, we vacate the judgment of the Court of Appeals and remand the case for further proceedings.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I agree with the plurality that even if obscenity on the Internet is defined in terms of local community standards, respondents have not shown that the Child Online Protection Act (COPA) is overbroad solely on the basis of the variation in the standards of different communities. See *ante*, at 577–579. Like JUSTICE BREYER, however, see *post*, at 589 (opinion concurring in part and concurring in judgment), I write separately to express my views on the constitutionality and desirability of adopting a national standard for obscenity for regulation of the Internet.

The plurality's opinion argues that, even under local community standards, the variation between the most and least restrictive communities is not so great with respect to the narrow category of speech covered by COPA as to, alone, render the statute substantially overbroad. See *ante*, at 577–579. I agree, given respondents' failure to provide examples of materials that lack literary, artistic, political, and scientific value for minors, which would nonetheless result in variation among communities judging the other elements of the test. Respondents' examples of material for which com-

munity standards would vary include such things as the appropriateness of sex education and the desirability of adoption by same-sex couples. Brief for Respondents 43. Material addressing the latter topic, however, seems highly unlikely to be seen to appeal to the prurient interest in any community, and educational material like the former must, on any objective inquiry, see *ante*, at 579, have scientific value for minors.

But respondents' failure to prove substantial overbreadth on a facial challenge in this case still leaves open the possibility that the use of local community standards will cause problems for regulation of obscenity on the Internet, for adults as well as children, in future cases. In an as-applied challenge, for instance, individual litigants may still dispute that the standards of a community more restrictive than theirs should apply to them. And in future facial challenges to regulation of obscenity on the Internet, litigants may make a more convincing case for substantial overbreadth. Where adult speech is concerned, for instance, there may in fact be a greater degree of disagreement about what is patently offensive or appeals to the prurient interest.

Nor do I think such future cases can be resolved by application of the approach we took in *Hamling* v. *United States*, 418 U. S. 87 (1974), and *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115 (1989). I agree with JUSTICE KENNEDY that, given Internet speakers' inability to control the geographic location of their audience, expecting them to bear the burden of controlling the recipients of their speech, as we did in *Hamling* and *Sable*, may be entirely too much to ask, and would potentially suppress an inordinate amount of expression. See *post*, at 594–596 (opinion concurring in judgment); contra, *ante*, at 580–584. For these reasons, adoption of a national standard is necessary in my view for any reasonable regulation of Internet obscenity.

Our precedents do not forbid adoption of a national standard. Local community-based standards originated with

*Miller* v. *California,* 413 U. S. 15 (1973). In that case, we approved jury instructions that based the relevant "community standards" on those of the State of California rather than on the Nation as a whole. In doing so, we held that "[n]othing in the First Amendment requires" that a jury consider national standards when determining if something is obscene as a matter of fact. *Id.,* at 31. The First Amendment, we held, did not require that "the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City." *Id.,* at 32. But we said nothing about the constitutionality of jury instructions that would contemplate a national standard—*i. e.,* requiring that the people who live in all of these places hold themselves to what the nationwide community of adults would find was patently offensive and appealed to the prurient interest.

Later, in *Jenkins* v. *Georgia,* 418 U. S. 153, 157 (1974), we confirmed that "*Miller* approved the use of [instructions based on local standards]; it did not mandate their use." The instructions we approved in that case charged the jury with applying "community standards" without designating any particular "community." In holding that a State may define the obscenity standard by stating the *Miller* standard without further specification, 418 U. S., at 157, *Jenkins* left open the possibility that jurors would apply any number of standards, including a national standard, in evaluating material's obscenity.

To be sure, the Court in *Miller* also stated that a national standard might be "unascertainable," 413 U. S., at 31, and "[un]realistic," *id.,* at 32. But where speech on the Internet is concerned, I do not share that skepticism. It is true that our Nation is diverse, but many local communities encompass a similar diversity. For instance, in *Miller* itself, the jury was instructed to consider the standards of the entire State of California, a large (today, it has a population of greater than 33 million people, see U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 23 (120th

ed. 2000) (Table 20)) and diverse State that includes both Berkeley and Bakersfield. If the *Miller* Court believed generalizations about the standards of the people of California were possible, and that jurors would be capable of assessing them, it is difficult to believe that similar generalizations are not also possible for the Nation as a whole. Moreover, the existence of the Internet, and its facilitation of national dialogue, has itself made jurors more aware of the views of adults in other parts of the United States. Although jurors asked to evaluate the obscenity of speech based on a national standard will inevitably base their assessments to some extent on their experience of their local communities, I agree with JUSTICE BREYER that the lesser degree of variation that would result is inherent in the jury system and does not necessarily pose a First Amendment problem. See *post*, at 591. In my view, a national standard is not only constitutionally permissible, but also reasonable.

While I would prefer that the Court resolve the issue before it by explicitly adopting a national standard for defining obscenity on the Internet, given respondents' failure to demonstrate substantial overbreadth due solely to the variation between local communities, I join Parts I, II, III–B, and IV of JUSTICE THOMAS' opinion and the judgment.

JUSTICE BREYER, concurring in part and concurring in the judgment.

I write separately because I believe that Congress intended the statutory word "community" to refer to the Nation's adult community taken as a whole, not to geographically separate local areas. The statutory language does not explicitly describe the specific "community" to which it refers. It says only that the "average person, applying contemporary community standards," must find that the "material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest . . . ." 47 U. S. C. § 231(e)(6) (1994 ed., Supp. V).

In the statute's legislative history, however, Congress made clear that it did not intend this ambiguous statutory phrase to refer to separate standards that might differ significantly among different communities. The relevant House of Representatives Report says:

> "The Committee recognizes that the applicability of community standards in the context of the Web is controversial, *but understands it as an 'adult' standard, rather than a 'geographic' standard, and one that is reasonably constant among adults in America with respect to what is suitable for minors."* H. R. Rep. No. 105–775, p. 28 (1998) (emphasis added).

This statement, reflecting what apparently was a uniform view within Congress, makes clear that the standard, and the relevant community, is national and adult.

At the same time, this view of the statute avoids the need to examine the serious First Amendment problem that would otherwise exist. See *Almendarez-Torres* v. *United States*, 523 U. S. 224, 237–238 (1998); *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring) (" 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided' "). To read the statute as adopting the community standards of every locality in the United States would provide the most puritan of communities with a heckler's Internet veto affecting the rest of the Nation. The technical difficulties associated with efforts to confine Internet material to particular geographic areas make the problem particularly serious. See *American Civil Liberties Union* v. *Reno*, 217 F. 3d 162, 175–176 (CA3 2000). And these special difficulties also potentially weaken the authority of prior cases in which they were not present. Cf. *Sable*

*Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115 (1989); *Hamling* v. *United States,* 418 U. S. 87 (1974). A nationally uniform adult-based standard—which Congress, in its Committee Report, said that it intended—significantly alleviates any special need for First Amendment protection. Of course some regional variation may remain, but any such variations are inherent in a system that draws jurors from a local geographic area and they are not, from the perspective of the First Amendment, problematic. See *id.,* at 105–106.

For these reasons I do not join Part III of JUSTICE THOMAS' opinion, although I agree with much of the reasoning set forth in Parts III–B and III–D, insofar as it explains the conclusion to which I just referred, namely, that variation reflecting application of the same national standard by different local juries does not violate the First Amendment.

JUSTICE KENNEDY, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, concurring in the judgment.

I

If a law restricts substantially more speech than is justified, it may be subject to a facial challenge. *Broadrick* v. *Oklahoma,* 413 U. S. 601, 615 (1973). There is a very real likelihood that the Child Online Protection Act (COPA or Act) is overbroad and cannot survive such a challenge. Indeed, content-based regulations like this one are presumptively invalid abridgments of the freedom of speech. See *R. A. V.* v. *St. Paul,* 505 U. S. 377, 382 (1992). Yet COPA is a major federal statute, enacted in the wake of our previous determination that its predecessor violated the First Amendment. See *Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997). Congress and the President were aware of our decision, and we should assume that in seeking to comply with it they have given careful consideration to the constitutionality of the new enactment. For these reasons, even if this facial challenge appears to have consider-

able merit, the Judiciary must proceed with caution and identify overbreadth with care before invalidating the Act.

In this case, the District Court issued a preliminary injunction against enforcement of COPA, finding it too broad across several dimensions. The Court of Appeals affirmed, but on a different ground. COPA defines "material that is harmful to minors" by reference to "contemporary community standards," 47 U. S. C. § 231(e)(6) (1994 ed., Supp. V); and on the theory that these vary from place to place, the Court of Appeals held that the definition dooms the statute "without reference to its other provisions." *American Civil Liberties Union* v. *Reno*, 217 F. 3d 162, 174 (CA3 2000). The Court of Appeals found it unnecessary to construe the rest of the Act or address the District Court's reasoning.

This single, broad proposition, stated and applied at such a high level of generality, cannot suffice to sustain the Court of Appeals' ruling. To observe only that community standards vary across the country is to ignore the antecedent question: community standards as to what? Whether the national variation in community standards produces overbreadth requiring invalidation of COPA, see *Broadrick*, *supra*, depends on the breadth of COPA's coverage and on what community standards are being invoked. Only by identifying the universe of speech burdened by COPA is it possible to discern whether national variation in community standards renders the speech restriction overbroad. In short, the ground on which the Court of Appeals relied cannot be separated from those that it overlooked.

The statute, for instance, applies only to "communication for commercial purposes." 47 U. S. C. § 231(e)(2)(A). The Court of Appeals, however, did not consider the amount of commercial communication, the number of commercial speakers, or the character of commercial speech covered by the Act. Likewise, the statute's definition of "harmful to minors" requires material to be judged "as a whole." § 231(e)(6)(C). The notion of judging work as a whole is

familiar in other media, but more difficult to define on the World Wide Web. It is unclear whether what is to be judged as a whole is a single image on a Web page, a whole Web page, an entire multipage Web site, or an interlocking set of Web sites. Some examination of the group of covered speakers and the categories of covered speech is necessary in order to comprehend the extent of the alleged overbreadth.

The Court of Appeals found that COPA in effect subjects every Internet speaker to the standards of the most puritanical community in the United States. This concern is a real one, but it alone cannot suffice to invalidate COPA without careful examination of the speech and the speakers within the ambit of the Act. For this reason, I join the judgment of the Court vacating the opinion of the Court of Appeals and remanding for consideration of the statute as a whole. Unlike JUSTICE THOMAS, however, I would not assume that the Act is narrow enough to render the national variation in community standards unproblematic. Indeed, if the District Court correctly construed the statute across its other dimensions, then the variation in community standards might well justify enjoining enforcement of the Act. I would leave that question to the Court of Appeals in the first instance.

## II

COPA provides a three-part conjunctive definition of "material that is harmful to minors." The first part of the definition is that "the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, [that it] is designed to appeal to, or is designed to pander to, the prurient interest." 47 U. S. C. § 231(e)(6)(A). (The parties agree that the second part of the definition, § 231(e)(6)(B), likewise invokes contemporary community standards, though only implicitly. See *ante*, at 576, n. 7.) The nub of the problem is, as the Court has said, that "the 'community standards' criterion as applied to the Internet means that any communication available to

a nationwide audience will be judged by the standards of the community most likely to be offended by the message." *Reno*, 521 U. S., at 877–878. If material might be considered harmful to minors in any community in the United States, then the material is covered by COPA, at least when viewed in that place. This observation was the linchpin of the Court of Appeals' analysis, and we must now consider whether it alone suffices to support the holding below.

The quoted sentence from *Reno* was not casual dicta; rather, it was one rationale for the holding of the case. In *Reno*, the Court found "[t]he breadth of [COPA's predecessor] . . . wholly unprecedented," *id.*, at 877, in part because of variation in community standards. The Court also relied on that variation to assess the strength of the Government's interest, which it found "not equally strong throughout the coverage of this broad statute." *Id.*, at 878. The Court illustrated the point with an example: A parent who e-mailed birth control information to his 17-year-old child at college might violate the Act, "even though neither he, his child, nor anyone in their home community found the material 'indecent' or 'patently offensive,' if the college town's community thought otherwise." *Ibid.* Variation in community standards rendered the statute broader than the scope of the Government's own expressed compelling interest.

It is true, as JUSTICE THOMAS points out, *ante*, at 580–583, that requiring a speaker addressing a national audience to meet varying community standards does not always violate the First Amendment. See *Hamling* v. *United States*, 418 U. S. 87, 106 (1974) (obscene mailings); *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 125–126 (1989) (obscene phone messages). These cases, however, are of limited utility in analyzing the one before us, because each mode of expression has its own unique characteristics, and each "must be assessed for First Amendment purposes by standards suited to it." *Southeastern Promotions, Ltd.* v. *Con-*

*rad*, 420 U. S. 546, 557 (1975). Indeed, when Congress purports to abridge the freedom of a new medium, we must be particularly attentive to its distinct attributes, for "differences in the characteristics of new media justify differences in the First Amendment standards applied to them." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 386 (1969). The economics and the technology of each medium affect both the burden of a speech restriction and the Government's interest in maintaining it.

In this case the District Court found as a fact that "[o]nce a provider posts its content on the Internet and chooses to make it available to all, it generally cannot prevent that content from entering any geographic community." *American Civil Liberties Union* v. *Reno*, 31 F. Supp. 2d 473, 484 (ED Pa. 1999). By contrast, in upholding a ban on obscene phone messages, we emphasized that the speaker could "hire operators to determine the source of the calls or engag[e] with the telephone company to arrange for the screening and blocking of out-of-area calls or fin[d] another means for providing messages compatible with community standards." *Sable, supra,* at 125. And if we did not make the same point in *Hamling,* that is likely because it is so obvious that mailing lends itself to geographic restriction. (The Court has had no occasion to consider whether venue would be proper in "every hamlet into which [obscene mailings] may wander," *Hamling, supra,* at 144 (dissenting opinion), for the petitioners in *Hamling* did not challenge the statute as overbroad on its face.) A publisher who uses the mails can choose the location of his audience.

The economics and technology of Internet communication differ in important ways from those of telephones and mail. Paradoxically, as the District Court found, it is easy and cheap to reach a worldwide audience on the Internet, see 31 F. Supp. 2d, at 482, but expensive if not impossible to reach a geographic subset, *id.,* at 484. A Web publisher in a community where avant garde culture is the norm may have no

desire to reach a national market; he may wish only to speak to his neighbors; nevertheless, if an eavesdropper in a more traditional, rural community chooses to listen in, there is nothing the publisher can do. As a practical matter, COPA makes the eavesdropper the arbiter of propriety on the Web. And it is no answer to say that the speaker should "take the simple step of utilizing a [different] medium." *Ante,* at 583 (principal opinion of THOMAS, J.). "Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression . . . . [T]he danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." *City of Ladue* v. *Gilleo,* 512 U. S. 43, 55 (1994).

JUSTICE BREYER would alleviate the problem of local variation in community standards by construing the statute to comprehend the "Nation's adult community taken as a whole," rather than the local community from which the jury is drawn. *Ante,* at 589 (opinion concurring in part and concurring in judgment); see also *ante,* at 586–589 (O'CONNOR, J., concurring in part and concurring in judgment). There is one statement in a House Committee Report to this effect, "reflecting," JUSTICE BREYER writes, "what apparently was a uniform view within Congress." *Ante,* at 590. The statement, perhaps, reflects the view of a majority of one House committee, but there is no reason to believe that it reflects the view of a majority of the House of Representatives, let alone the "uniform view within Congress." *Ibid.*

In any event, we need not decide whether the statute invokes local or national community standards to conclude that vacatur and remand are in order. If the statute does incorporate some concept of national community standards, the actual standard applied is bound to vary by community nevertheless, as the Attorney General concedes. See *ante,* at 577 (principal opinion of THOMAS, J.); Brief for Petitioner 39.

For this reason the Court of Appeals was correct to focus on COPA's incorporation of varying community standards; and it may have been correct as well to conclude that in practical effect COPA imposes the most puritanical community standard on the entire country. We have observed that it is "neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City." *Miller* v. *California,* 413 U. S. 15, 32 (1973). On the other hand, it is neither realistic nor beyond constitutional doubt for Congress, in effect, to impose the community standards of Maine or Mississippi on Las Vegas and New York. "People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Id.,* at 33. In striking down COPA's predecessor, the *Reno* Court identified this precise problem, and if the *Hamling* and *Sable* Courts did not find the problem fatal, that is because those cases involved quite different media. The national variation in community standards constitutes a particular burden on Internet speech.

### III

The question that remains is whether this observation "*by itself*" suffices to enjoin the Act. See *ante,* at 585. I agree with the Court that it does not. *Ibid.* We cannot know whether variation in community standards renders the Act substantially overbroad without first assessing the extent of the speech covered and the variations in community standards with respect to that speech.

First, the breadth of the Act itself will dictate the degree of overbreadth caused by varying community standards. Indeed, JUSTICE THOMAS sees this point and uses it in an attempt to distinguish the Communications Decency Act of 1996, which was at issue in *Reno.* See *ante,* at 577–578 ("The CDA's use of community standards to identify patently

offensive material, however, was particularly problematic in light of that statute's unprecedented breadth and vagueness"); *ante,* at 578 ("The tremendous breadth of the CDA magnified the impact caused by differences in community standards across the country"). To explain the ways in which COPA is narrower than the CDA, JUSTICE THOMAS finds that he must construe sections of COPA elided by the Court of Appeals. Though I agree with the necessity for doing so, JUSTICE THOMAS' interpretation—undertaken without substantial arguments or briefing—is not altogether persuasive, and I would leave this task to the Court of Appeals in the first instance. As this case comes to us, once it is accepted that we cannot strike down the Act based merely on the phrase "contemporary community standards," we should go no further than to vacate and remand for a more comprehensive analysis of the Act.

Second, community standards may have different degrees of variation depending on the question posed to the community. Defining the scope of the Act, therefore, is not relevant merely to the absolute number of Web pages covered, as JUSTICE STEVENS suggests, *post,* at 609–610 (dissenting opinion); it is also relevant to the proportion of overbreadth, "judged in relation to the statute's plainly legitimate sweep," *Broadrick,* 413 U. S., at 615. Because this issue was "virtually ignored by the parties and the amicus" in the Court of Appeals, 217 F. 3d, at 173, we have no information on the question. Instead, speculation meets speculation. On the one hand, the Court of Appeals found "no evidence to suggest that adults *everywhere* in America would share the same standards for determining what is harmful to minors." *Id.,* at 178. On the other hand, JUSTICE THOMAS finds "no reason to believe that the practical effect of varying community standards under COPA . . . is significantly greater than the practical effect of varying community standards under federal obscenity statutes." *Ante,* at 583–584. When a key issue has "no evidence" on one side and "no reason to be-

lieve" the other, it is a good indication that we should vacate for further consideration.

The District Court attempted a comprehensive analysis of COPA and its various dimensions of potential overbreadth. The Court of Appeals, however, believed that its own analysis of "contemporary community standards" obviated all other concerns. It dismissed the District Court's analysis in a footnote:

> "[W]e do not find it necessary to address the District Court's analysis of the definition of 'commercial purposes'; whether the breadth of the forms of content covered by COPA could have been more narrowly tailored; whether the affirmative defenses impose too great a burden on Web publishers or whether those affirmative defenses should have been included as elements of the crime itself; whether COPA's inclusion of criminal as well as civil penalties was excessive; whether COPA is designed to include communications made in chat rooms, discussion groups and links to other Web sites; whether the government is entitled to so restrict communications when children will continue to be able to access foreign Web sites and other sources of material that is harmful to them; what taken 'as a whole' should mean in the context of the Web and the Internet; or whether the statute's failure to distinguish between material that is harmful to a six year old versus a sixteen year old is problematic."   217 F. 3d, at 174, n. 19.

As I have explained, however, any problem caused by variation in community standards cannot be evaluated in a vacuum. In order to discern whether the variation creates substantial overbreadth, it is necessary to know what speech COPA regulates and what community standards it invokes.

It is crucial, for example, to know how limiting is the Act's limitation to "communication for commercial purposes." 47 U. S. C. §231(e)(2)(A). In *Reno*, we remarked that COPA's

predecessor was so broad in part because it had no such limitation. 521 U. S., at 877. COPA, by contrast, covers a speaker only if:

> "the person who makes a communication or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income)." 47 U. S. C. § 231(e)(2)(B).

So COPA is narrower across this dimension than its predecessor; but how much narrower is a matter of debate. In the District Court, the Attorney General contended that the Act applied only to professional panderers, but the court rejected that contention, finding "nothing in the text of the COPA . . . that limits its applicability to so-called commercial pornographers only." 31 F. Supp. 2d, at 480. Indeed, the plain text of the Act does not limit its scope to pornography that is offered for sale; it seems to apply even to speech provided for free, so long as the speaker merely hopes to profit as an indirect result. The statute might be susceptible of some limiting construction here, but again the Court of Appeals did not address itself to this question. The answer affects the breadth of the Act and hence the significance of any variation in community standards.

Likewise, it is essential to answer the vexing question of what it means to evaluate Internet material "as a whole," 47 U. S. C. §§ 231(e)(6)(A), (C), when everything on the Web is connected to everything else. As a general matter, "[t]he artistic merit of a work does not depend on the presence of a single explicit scene. . . . [T]he First Amendment requires

that redeeming value be judged by considering the work as a whole. Where the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive." *Ashcroft* v. *Free Speech Coalition, ante,* at 248. COPA appears to respect this principle by requiring that the material be judged "as a whole," both as to its prurient appeal, §231(e)(6)(A), and as to its social value, §231(e)(6)(C). It is unclear, however, what constitutes the denominator—that is, the material to be taken as a whole—in the context of the World Wide Web. See 31 F. Supp. 2d, at 483 ("Although information on the Web is contained in individual computers, the fact that each of these computers is connected to the Internet through World Wide Web protocols allows all of the information to become part of a single body of knowledge"); *id.,* at 484 ("From a user's perspective, [the World Wide Web] may appear to be a single, integrated system"). Several of the respondents operate extensive Web sites, some of which include only a small amount of material that might run afoul of the Act. The Attorney General contended that these respondents had nothing to fear from COPA, but the District Court disagreed, noting that the Act prohibits communication that "includes" any material harmful to minors. §231(a)(1). In the District Court's view, "it logically follows that [COPA] would apply to any Web site that contains only some harmful to minors material." *Id.,* at 480. The denominator question is of crucial significance to the coverage of the Act.

Another issue is worthy of mention, because it too may inform whether the variation in community standards renders the Act substantially overbroad. The parties and the Court of Appeals did not address the question of venue, though it would seem to be bound up with the issue of varying community standards. COPA does not address venue in explicit terms, so prosecution may be proper "in any district in which [an] offense was begun, continued, or completed." 18 U. S. C. §3237(a). The Act's prohibition includes an inter-

state commerce element, 47 U. S. C. § 231(a)(1), and "[a]ny offense involving . . . interstate . . . commerce . . . may be inquired of and prosecuted in any district from, through, or into which such commerce . . . moves." 18 U. S. C. § 3237(a). In the context of COPA, it seems likely that venue would be proper where the material originates or where it is viewed. Whether it may be said that a Web site moves "through" other venues in between is less certain. And since, as discussed above, juries will inevitably apply their own community standards, the choice of venue may be determinative of the choice of standard. The more venues the Government has to choose from, the more speech will be chilled by variation across communities.

## IV

In summary, the breadth of the Act depends on the issues discussed above, and the significance of varying community standards depends, in turn, on the breadth of the Act. The Court of Appeals was correct to focus on the national variation in community standards, which can constitute a substantial burden on Internet communication; and its ultimate conclusion may prove correct. There may be grave doubts that COPA is consistent with the First Amendment; but we should not make that determination with so many questions unanswered. The Court of Appeals should undertake a comprehensive analysis in the first instance.

JUSTICE STEVENS, dissenting.

Appeals to prurient interests are commonplace on the Internet, as in older media. Many of those appeals lack serious value for minors as well as adults. Some are offensive to certain viewers but welcomed by others. For decades, our cases have recognized that the standards for judging their acceptability vary from viewer to viewer and from community to community. Those cases developed the requirement that communications should be protected if they do not violate contemporary community standards. In its original

form, the community standard provided a shield for communications that are offensive only to the least tolerant members of society. Thus, the Court "has emphasized on more than one occasion that a principal concern in requiring that a judgment be made on the basis of 'contemporary community standards' is to assure that the material is judged neither on the basis of each juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group." *Hamling* v. *United States*, 418 U. S. 87, 107 (1974). In the context of the Internet, however, community standards become a sword, rather than a shield. If a prurient appeal is offensive in a puritan village, it may be a crime to post it on the World Wide Web.

The Child Online Protection Act (COPA) restricts access by adults as well as children to materials that are "harmful to minors." 47 U. S. C. § 231(a)(1) (1994 ed., Supp. V). COPA is a substantial improvement over its predecessor, the Communications Decency Act of 1996 (CDA), which we held unconstitutional five years ago in *Reno* v. *American Civil Liberties Union*, 521 U. S. 844 (1997) *(ACLU I)*. Congress has thoughtfully addressed several of the First Amendment problems that we identified in that case. Nevertheless, COPA preserves the use of contemporary community standards to define which materials are harmful to minors. As we explained in *ACLU I*, 521 U. S., at 877–878, "the 'community standards' criterion as applied to the Internet means that any communication available to a nationwide audience will be judged by the standards of the community most likely to be offended by the message."

We have recognized that the State has a compelling interest in protecting minors from harmful speech, *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989), and on one occasion we upheld a restriction on indecent speech that was made available to the general public, because it could be accessed by minors, *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978). Our decision in that case was influ-

enced by the distinctive characteristics of the broadcast medium, as well as the expertise of the agency, and the narrow scope of its order. *Id.*, at 748–750; see also *ACLU I*, 521 U. S., at 867. On the other hand, we have repeatedly rejected the position that the free speech rights of adults can be limited to what is acceptable for children. See *id.*, at 875 (quoting *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 74–75 (1983) ("[R]egardless of the strength of the government's interest" in protecting children, "[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox" (internal quotation marks omitted))); *Sable*, 492 U. S., at 128; *Butler* v. *Michigan*, 352 U. S. 380, 383 (1957).

Petitioner relies on our decision in *Ginsberg* v. *New York*, 390 U. S. 629 (1968), for the proposition that Congress can prohibit the *display* of materials that are harmful to minors. But the statute upheld in *Ginsberg* prohibited *selling* indecent materials directly to children, *id.*, at 633 (describing N. Y. Penal Law § 484–h, making it unlawful " 'knowingly to sell . . . to a minor . . .' "), whereas the speech implicated here is simply posted on a medium that is accessible to both adults and children, 47 U. S. C. § 231(a)(1) (prohibiting anyone from "knowingly . . . mak[ing] any communication for commercial purposes that is available to any minor . . ."). Like the restriction on indecent "dial-a-porn" numbers invalidated in *Sable*, the prohibition against mailing advertisements for contraceptives invalidated in *Bolger*, and the ban against selling adult books found impermissible in *Butler*, COPA seeks to limit protected speech that is not targeted at children, simply because it can be obtained by them while surfing the Web.[1] In evaluating the overbreadth of such a

---

[1] Petitioner cites examples of display statutes in 23 States that require magazine racks to shield minors from the covers of pornographic magazines. Brief for Petitioner 22, 3a. This Court has yet to rule on the constitutionality of any of these statutes, which are in any event of little relevance to regulation of speech on the Internet. As we recognized in

statute, we should be mindful of Justice Frankfurter's admonition not to "burn the house to roast the pig," *Butler*, 352 U. S., at 383.

COPA not only restricts speech that is made available to the general public, it also covers a medium in which speech cannot be segregated to avoid communities where it is likely to be considered harmful to minors. The Internet presents a unique forum for communication because information, once posted, is accessible everywhere on the network at once. The speaker cannot control access based on the location of the listener, nor can it choose the pathways through which its speech is transmitted. By approving the use of community standards in this context, JUSTICE THOMAS endorses a construction of COPA that has "the intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency." *Manual Enterprises, Inc.* v. *Day*, 370 U. S. 478, 488 (1962).

If the material were forwarded through the mails, as in *Hamling*, or over the telephone, as in *Sable*, the sender could avoid destinations with the most restrictive standards. Indeed, in *Sable*, we upheld the application of community standards to a nationwide medium because the speaker was "free to tailor its messages . . . to the communities it *chooses* to serve," by either "hir[ing] operators to determine the source of the calls . . . [or] arrang[ing] for the screening and blocking of out-of-area calls." 492 U. S., at 125 (emphasis added). Our conclusion that it was permissible for the speaker to bear the ultimate burden of compliance, *id.*, at 126, assumed that such compliance was at least possible without requiring the speaker to choose another medium or to limit its speech to what all would find acceptable. Given the

*ACLU I*, 521 U. S. 844, 854 (1997), "'the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial'"—or scanning a magazine rack.

undisputed fact that a provider who posts material on the Internet cannot prevent it from entering any geographic community, see *ante*, at 575, n. 6 (opinion of THOMAS, J.), a law that criminalizes a particular communication in just a handful of destinations effectively prohibits transmission of that message to all of the 176.5 million Americans that have access to the Internet, see *ante*, at 567, n. 2 (majority opinion). In light of this fundamental difference in technologies, the rules applicable to the mass mailing of an obscene montage or to obscene dial-a-porn should not be used to judge the legality of messages on the World Wide Web.[2]

In his attempt to fit this case within the framework of *Hamling* and *Sable*, JUSTICE THOMAS overlooks the more obvious comparison—namely, the CDA invalidated in *ACLU I*. When we confronted a similar attempt by Congress to limit speech on the Internet based on community standards, we explained that because Web publishers cannot control who accesses their Web sites, using community standards to regulate speech on the Internet creates an overbreadth problem. "[T]he 'community standards' criterion as applied to the Internet means that any communication available to a nationwide audience will be judged by the standards of the community most likely to be offended by the message." 521 U. S., at 877–878. Although our holding in *ACLU I* did not turn on that factor alone, we did not adopt the position relied on by JUSTICE THOMAS—that applying community standards to the Internet is constitutional based on *Hamling* and

---

[2] It is hardly a solution to say, as JUSTICE THOMAS suggests, *ante*, at 583, that a speaker need only choose a different medium in order to avoid having its speech judged by the least tolerant community. Our overbreadth doctrine would quickly become a toothless protection if we were to hold that substituting a more limited forum for expression is an acceptable price to pay. Since a content-based restriction is presumptively invalid, I would place the burden on parents to "take the simple step of utilizing a medium that enables," *ibid.*, them to avoid this material before requiring the speaker to find another forum.

*Sable.* See Reply Brief for Appellants in *Reno* v. *ACLU,* O. T. 1996, No. 96–511, p. 19.[3]

JUSTICE THOMAS points to several other provisions in COPA to argue that any overbreadth will be rendered insubstantial by the rest of the statute. *Ante,* at 578–579. These provisions afford little reassurance, however, as they only marginally limit the sweep of the statute. It is true that, in addition to COPA's "appeals to the prurient interest of minors" prong, the material must be "patently offensive with respect to minors" and it must lack "serious literary, artistic, political, or scientific value for minors." 47 U. S. C. § 231(e)(6). Nonetheless, the "patently offensive" prong is judged according to contemporary community standards as well, *ante,* at 576, n. 7 (opinion of THOMAS, J.). Whatever disparity exists between various communities' assessment of the content that appeals to the prurient interest of minors will surely be matched by their differing opinions as to

---

[3] JUSTICE BREYER seeks to avoid the problem by effectively reading the phrase "contemporary national standards" into the statute, *ante,* at 589 (opinion concurring in part and concurring in judgment). While the legislative history of COPA provides some support for this reading, it is contradicted by the clear text of the statute, which directs jurors to consider "community" standards. This phrase is a term of art that has taken on a particular meaning in light of our precedent. Although we have never held that applying a national standard would be constitutionally impermissible, we have said that asking a jury to do so is "an exercise in futility," *Miller* v. *California,* 413 U. S. 15, 30 (1973), and that "[a] juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination," *Hamling* v. *United States,* 418 U. S. 87, 104 (1974). Any lingering doubts about the meaning of the phrase were certainly dispelled by our discussion of the issue in *ACLU I,* 521 U. S., at 874, n. 39, and we presume that Congress legislates against the backdrop of our decisions. Therefore, JUSTICE THOMAS has correctly refused to rewrite the statute to substitute a standard that Congress clearly did not choose. And even if the plurality were willing to do so, we would still have to acknowledge, as petitioner does, that jurors instructed to apply a national, or adult, standard will reach widely different conclusions throughout the country, see *ante,* at 577; Brief for Petitioner 39.

whether descriptions of sexual acts or depictions of nudity are patently offensive with respect to minors. Nor does the requirement that the material be "in some sense erotic," see *ante*, at 579 (citing *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 213, and n. 10 (1975)), substantially narrow the category of images covered. Arguably every depiction of nudity—partial or full—is in some sense erotic *with respect to minors*.[4]

Petitioner's argument that the "serious value" prong minimizes the statute's overbreadth is also unpersuasive. Although we have recognized that the serious value determination in obscenity cases should be based on an objective, reasonable person standard, *Pope* v. *Illinois*, 481 U. S. 497, 500 (1987), this criterion is inadequate to cure COPA's overbreadth because COPA adds an important qualifying phrase to the standard *Miller* v. *California*, 413 U. S. 15 (1973), formulation of the serious value prong. The question for the jury is not whether a reasonable person would conclude that the materials have serious value; instead, the jury must determine whether the materials have serious value *for minors*. Congress reasonably concluded that a substantial number of works, which have serious value for adults, do not have serious value for minors. Cf. *ACLU I*, 521 U. S., at 896 (O'CONNOR, J., concurring in judgment in part and dissenting in part) ("While discussions about prison rape or nude art . . . may have some redeeming educational value for *adults*, they do not necessarily have any such value for *minors*"). Thus, even though the serious value prong limits the total amount of speech covered by the statute, it remains true that there is a significant amount of protected speech within the category of materials that have no serious value for minors. That speech is effectively prohibited whenever

---

[4] Of course, JUSTICE THOMAS' example of the image "of a war victim's wounded nude body," *ante*, at 579, n. 9, would not be covered by the statute unless it depicted "a lewd exhibition of the genitals or post-pubescent female breast" and lacked serious political value for minors, 47 U. S. C. §§ 231(e)(6)(B)–(C) (1994 ed., Supp. V).

the least tolerant communities find it harmful to minors.[5]
While the objective nature of the inquiry may eliminate any
worry that the serious value determination will be made by
the least tolerant community, it does not change the fact that,
within the subset of images deemed to have no serious value
for minors, the decision whether minors and adults through-
out the country will have access to that speech will still be
made by the most restrictive community.

JUSTICE KENNEDY makes a similar misstep, *ante*, at 592
(opinion concurring in judgment), when he ties the over-
breadth inquiry to questions about the scope of the other
provisions of the statute. According to his view, we cannot
determine whether the statute is substantially overbroad
based on its use of community standards without first deter-
mining how much of the speech on the Internet is saved by
the other restrictions in the statute. But this represents a
fundamental misconception of our overbreadth doctrine. As
Justice White explained in *Broadrick* v. *Oklahoma,* 413 U. S.

---

[5] The Court also notes that the limitation to communications made for
commercial purposes narrows the category of speech as compared to the
CDA, *ante,* at 569. While it is certainly true that this condition lim-
its the scope of the statute, the phrase "commercial purposes" is some-
what misleading. The definition of commercial purposes, 47 U. S. C.
§ 231(e)(2)(B), covers anyone who generates revenue from advertisements
or merchandise, regardless of the amount of advertising or whether the
advertisements or products are related to the images that allegedly are
harmful to minors. As the District Court noted: "There is nothing in
the text of the COPA, however, that limits its applicability to so-called
commercial pornographers only; indeed, the text of COPA imposes liability
on a speaker who knowingly makes any communication for commercial
purposes 'that *includes any material* that is harmful to minors,'" App. to
Pet. for Cert. 52a. In the context of the Internet, this is hardly a serious
limitation. A 1998 study, for example, found that 83 percent of Web sites
contain commercial content. Lawrence & Giles, Accessibility of informa-
tion of the web, 400 Nature 107–109 (1999); Guernsey, Seek—but on the
Web, You Might Not Find, N. Y. Times, July 8, 1999, p. G3. Interestingly,
this same study found that only 1.5 percent of the 2.8 million sites cata-
loged contained pornographic content.

601, 615 (1973), "the overbreadth of a statute must not only be real, but substantial as well, *judged in relation to the statute's plainly legitimate sweep.*" (Emphasis added.) Regardless of how the Court of Appeals interprets the "commercial purposes" or "as a whole" provisions on remand, the question we must answer is whether the statute restricts a substantial amount of protected speech relative to its legitimate sweep by virtue of the fact that it uses community standards.[6] These other provisions may reduce the absolute number of Web pages covered by the statute, but even the narrowest version of the statute abridges a substantial amount of protected speech that many communities would not find harmful to minors. Because Web speakers cannot limit access to those specific communities, the statute is substantially overbroad regardless of how its other provisions are construed.

JUSTICE THOMAS acknowledges, and petitioner concedes, that juries across the country will apply different standards and reach different conclusions about whether particular works are harmful to minors. See *ante*, at 577; Brief for Petitioner 3–4, 39. We recognized as much in *ACLU I* when we noted that "discussions about prison rape or safe sexual practices, artistic images that include nude subjects, and arguably the card catalog of the Carnegie Library" might offend some community's standards and not others, 521 U. S., at 878. In fact, our own division on that question provides further evidence of the range of attitudes about such material. See, *e. g.*, *id.*, at 896 (O'CONNOR, J., concurring in judg-

---

[6] JUSTICE KENNEDY accuses the Court of Appeals of evaluating overbreadth in a vacuum by dismissing most of the concerns raised by the District Court, *ante*, at 599. But most of those concerns went to whether COPA survives strict scrutiny, not overbreadth. Even under JUSTICE KENNEDY's formulation, it is unclear why it is relevant to an overbreadth analysis, for example, whether COPA could have been more narrowly tailored, whether the affirmative defenses impose too great a burden, or whether inclusion of criminal as well as civil penalties was excessive.

ment in part and dissenting in part). Moreover, *amici* for respondents describe studies showing substantial variation among communities in their attitudes toward works involving homosexuality, masturbation, and nudity.[7]

Even if most, if not all, of these works would be excluded from COPA's coverage by the serious value prong, they illustrate the diversity of public opinion on the underlying themes depicted. This diversity of views surely extends to whether materials with the same themes, that do not have serious value for minors, appeal to their prurient interests and are patently offensive. There is no reason to think the differences between communities' standards will disappear once the image or description is no longer within the context of a work that has serious value for minors.[8] Because communities differ widely in their attitudes toward sex, particularly when minors are concerned, the Court of Appeals was correct to conclude that, regardless of how COPA's other provisions are construed, applying community standards to the Internet will restrict a substantial amount of protected speech that would not be considered harmful to minors in many communities.

Whether that consequence is appropriate depends, of course, on the content of the message. The kind of hardcore pornography involved in *Hamling*, which I assume would be obscene under any community's standard, does not belong on the Internet. Perhaps "teasers" that serve no function except to invite viewers to examine hardcore materials, or the hidden terms written into a Web site's "metatags" in order to dupe unwitting Web surfers into visiting pornographic sites, deserve the same fate. But COPA ex-

---

[7] Brief for Volunteer Lawyers for the Arts et al. as *Amici Curiae* 4–10 (describing findings of the People for the American Way Foundation Annual Freedom to Learn Reports).

[8] Nor is there any reason to expect that a particular community's view of the material will change based on how the Court of Appeals construes the statute's "for commercial purposes" or "as a whole" provisions.

tends to a wide range of prurient appeals in advertisements, online magazines, Web-based bulletin boards and chat rooms, stock photo galleries, Web diaries, and a variety of illustrations encompassing a vast number of messages that are unobjectionable in most of the country and yet provide no "serious value" for minors. It is quite wrong to allow the standards of a minority consisting of the least tolerant communities to regulate access to relatively harmless messages in this burgeoning market.

In the context of most other media, using community standards to differentiate between permissible and impermissible speech has two virtues. As mentioned above, community standards originally served as a shield to protect speakers from the least tolerant members of society. By aggregating values at the community level, the *Miller* test eliminated the outliers at both ends of the spectrum and provided some predictability as to what constitutes obscene speech. But community standards also serve as a shield to protect audience members, by allowing people to self-sort based on their preferences. Those who abhor and those who tolerate sexually explicit speech can seek out like-minded people and settle in communities that share their views on what is acceptable for themselves and their children. This sorting mechanism, however, does not exist in cyberspace; the audience cannot self-segregate. As a result, in the context of the Internet this shield also becomes a sword, because the community that wishes to live without certain material rids not only itself, but the entire Internet, of the offending speech.

In sum, I would affirm the judgment of the Court of Appeals and therefore respectfully dissent.