# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 18-30136

—————

BONNIE M. O'DANIEL,

Plaintiff - Appellant

v.

INDUSTRIAL SERVICE SOLUTIONS; PLANT-N-POWER SERVICES, INCORPORATED; TEX SIMONEAUX, JR.; CINDY HUBER

Defendants - Appellees

—————————

Appeal from the United States District Court
for the Middle District of Louisiana

—————————

United States Court of Appeals
Fifth Circuit

**FILED**

April 19, 2019

Lyle W. Cayce
Clerk

Before JONES, HAYNES, and OLDHAM, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Plaintiff-Appellant Bonnie O'Daniel ("O'Daniel") sued her former employers Defendants-Appellees Industrial Service Solutions ("ISS"), Plant-N-Power Services ("PNP"), Tex Simoneaux, Jr. ("Simoneaux"), and Cindy Huber ("Huber") for firing her allegedly because of "the Plaintiff's sexual orientation [heterosexual] and Ms. Huber's reaction to the Plaintiff's pr[o]-heterosexual speech." The magistrate judge, acting by consent, dismissed her complaint pursuant to Fed. R. Civ. Pro.12(b)(6) for failure to state cognizable claims of Title VII retaliation and Louisiana law violations. Finding no reversible error, we AFFIRM.

No. 18-30136

## I. BACKGROUND

O'Daniel's complaint centers on her employers' response to a Facebook post she made that ultimately led to her dismissal. We recite the facts as pled in O'Daniel's complaint.

O'Daniel began working in the Louisiana office of PNP in 2013 as the manager of PNP's human resources department. Simoneaux and Huber were part owners of PNP, and when PNP combined with ISS, Huber became President and Simoneaux became Vice President of Eastern Operations. During her time with PNP, an employment agency, O'Daniel alleges she developed a fantastic relationship with all three owners, although she never personally met Huber, who worked in the Texas office.

On April 22, 2016, O'Daniel made the incendiary Facebook post. While O'Daniel refers to the post simply as "that of a man at Target wearing a dress and not[ing] his ability to use the women's bathroom and/or dressing room with Mrs. O'Daniel's young daughters,"[1] the text of O'Daniel's post is as follows: "So meet, ROBERTa! Shopping in the women's department for a swimsuit at the BR Target. For all of you people that say you don't care what bathroom it's using, you're full of shit!! Let this try to walk in the women's bathroom while my daughters are in there!! #hellwillfreezeoverfirst."[2] The post tagged O'Daniel's husband and included photos of the individual referred to in the post.

---

[1] O'Daniel's proposed second amended complaint instead states that her "post expressed the Plaintiff's views on an ongoing public debate, specifically her discontent with the possibility of this individual being permitted to use a women's bathroom and/or dressing room at the same time as Plaintiff's young daughters."

[2] A copy of her Facebook post was not attached to any of her complaints; however, Appellants attached a copy to their motion to dismiss. O'Daniel did not, and does not, object.

No. 18-30136

After O'Daniel made the post, it was shared with Simoneaux and Huber. Simoneaux informed O'Daniel that Huber wanted her fired immediately and she had personally taken offense to the post because Huber was a member of the LGBT community.[3] The next day, Simoneaux informed O'Daniel that Huber wanted to know for whom her husband worked, as Huber felt a responsibility to report the Facebook post to his employer. Simoneaux also told O'Daniel that Huber had taken the Facebook post personally and felt the post wronged all members of the LGBT community, including herself. On or about April 24, 2016, Huber texted O'Daniel and told her to be available for a phone conference the following day. O'Daniel sent a text message to Simoneaux saying she felt she was being discriminated against because she was heterosexual.

O'Daniel participated in the conference call with Huber and ISS corporate counsel and was informed she must take a sensitivity/diversity training course and could no longer recruit through social media.[4] She also received a letter of reprimand in response to her post, which stated that O'Daniel had had previous discussions regarding her job performance and areas for improvement.[5] O'Daniel denies she had ever signed a single complaint against her before the letter of reprimand, and Huber had never before brought up issues with O'Daniel's work performance. In fact, before the

---

[3] O'Daniel removed the reference to Huber's sexual orientation from her proposed second amended complaint. She also added information that the post was copied and shared by Facebook users, that O'Daniel apologized and explained to Huber that the post was not intended as an attack against the LGBT community generally, and that Huber still wanted to fire O'Daniel immediately.

[4] O'Daniel's proposed second amended complaint alleges these extra limitations on recruitment were "unrealistic."

[5] O'Daniel's proposed second amended complaint added that she had not been informed of any perceived problems with her job performance prior to receiving the letter.

Facebook post, O'Daniel had a "great relationship" with Huber, as the two regularly exchanged jokes and pictures by text. Huber had even sponsored O'Daniel's daughter's softball team through PNP for two years. After the post, Huber refused to engage with O'Daniel on a personal level.

Several days after her post, O'Daniel was placed under the direct supervision of Huber, who allegedly conspired with Simoneaux to create a hostile work environment in the hope that O'Daniel would quit or be fired. O'Daniel was given three dates in May on which she could take the sensitivity training, and for various reasons, she was unable to complete the training on those dates. On May 24, 2016, O'Daniel sent a text to Simoneaux that Huber's actions had "reached a harassing level."[6] Huber was irate that O'Daniel had not attended any of the three trainings, wanted her fired immediately, and suggested to Simoneaux that he and O'Daniel were having an affair because Simoneaux was fighting to keep her job. At the end of May, Huber sent new rules that only applied to O'Daniel, including modifying her schedule to conflict with her children's schedules and putting her on a time clock. O'Daniel confronted Simoneaux that she had "finally reached breaking point" and that she would be filing a formal complaint.[7] Simoneaux told O'Daniel not to file a complaint and that he would inform Human Resources of the situation. However, he never notified Human Resources about Huber's alleged discrimination and no investigations of the harassment or discrimination took place.

---

[6] In her proposed second amended complaint, O'Daniel alleged instead that Huber's actions "had risen to the level of sex-based harassment."

[7] In her proposed second amended complaint, O'Daniel clarified that her formal complaint would include allegations that Huber "discriminated against her on the basis of her sex, as a married, heterosexual female."

No. 18-30136

Over the next couple of weeks, O'Daniel received an email reprimand from Simoneaux stating wrongly that she was not doing her job properly. She also received hints that PNP's Louisiana office may need to downsize and make cuts to personnel. Around June 8, O'Daniel told the Defendants in writing that she was being subjected to discrimination and harassment and she planned on filing a formal complaint. About a week later, Simoneaux told O'Daniel that the next week would be her last at PNP. When, on June 21, Huber found out that O'Daniel was still employed with PNP, she informed Simoneaux that she was shutting down O'Daniel's email at noon. O'Daniel's separation notice stated she was "fired due to unsatisfactory job performance." However, when O'Daniel filed for unemployment benefits and challenged their denial due to employee misconduct, PNP did not participate in the scheduled hearing and "Louisiana workforce" eventually ruled in favor of O'Daniel. O'Daniel filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on December 20, 2016, and received her right to sue letter shortly afterward.

O'Daniel alleges Huber is no longer with PNP after being investigated for dishonesty involving financial records. She also alleges that the current human resources manager at PNP made several Facebook posts that included profanity, including one towards a PNP employee who subsequently quit. But the manager never received a reprimand.[8] O'Daniel does not mention the sexual orientation of the new human resources manager.

O'Daniel filed her initial complaint *pro se*, alleging violations of multiple anti-discrimination laws, wrongful termination, and intentional infliction of severe emotion distress. A first amended complaint then updated her causes of action to reflect discrimination claims under Title VII of the Civil Rights Act,

---

[8] O'Daniel's proposed second amended complaint removes reference to all the instances of the new human resources director's Facebook posts except the one directed at the PNP employee.

42 U.S.C. § 2000e *et seq.*, and various Louisiana statutes. After O'Daniel filed her first amended complaint, Defendants moved to dismiss. Before her response to the motion to dismiss was due, O'Daniel obtained counsel who moved to amend her complaint and responded to Defendants' motion. The parties briefed the issues and the district court analyzed and resolved both motions together, granting Appellants' motion to dismiss and denying O'Daniel's motion for leave to amend. O'Daniel appeals the district court's resolution of both motions.

## II.    STANDARD OF REVIEW

This court reviews a district court's decision to dismiss under Rule 12(b)(6) *de novo*. *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 590 (5th Cir.), *cert. denied*, 138 S. Ct. 101 (2017). We accept all well-pleaded facts in the complaint as true and view the facts in the light most favorable to the plaintiff. *Id.* "However, those facts, 'taken as true, [must] state a claim that is plausible on its face.'" *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012) (quoting *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254 (5th Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

## III.    DISCUSSION

At issue in this appeal are the plaintiff's claims for Title VII retaliation and Louisiana constitutional violations. We discuss each in turn. Although the plaintiff's allegations and briefing are somewhat ambiguous, she does not brief adequately that she was dismissed because of her sexual orientation, and

No. 18-30136

any such claim is waived.  *See Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 407 n.9, 417 (5th Cir. 2009).

### A.     Title VII Retaliation Claim

O'Daniel argues the district court erred in dismissing her claim for retaliation under Title VII for several reasons.  First, she contends the district court erred in finding that Title VII does not protect against discrimination on the basis of sexual orientation.  Second, even if Title VII does not prohibit sexual orientation discrimination, the district court erred in finding that she could not have reasonably believed discrimination on the basis of sexual orientation was a prohibited practice.  Third, O'Daniel takes issue with the district court's determination that, even if sexual orientation is a protected class and/or O'Daniel reasonably believed it to be so, she failed to state a claim for retaliation under Title VII.  Because her first two arguments fail as a matter of law, we need not reach the third contention.

The EEOC submitted an *amicus curiae* brief, as did the American Civil Liberties Union Foundation and several other organizations, asserting that Title VII ought to encompass sexual orientation as a protected class.[9]  Amici further urge that whether or not Fifth Circuit precedent recognizes a claim for discrimination on the basis of sexual orientation under Title VII, in the spring of 2016 when O'Daniel stated she would file an EEOC complaint, O'Daniel could have reasonably believed sexual orientation discrimination was prohibited by Title VII.[10]

---

[9] *See Baldwin v. Foxx,* EEOC App. No. 0120133080, 2015 WL 4397641 (EEOC July 15, 2015)(EEOC administratively declaring that Title VII prohibits "sex" discrimination based on sexual orientation.

[10] O'Daniel also challenges the district court's denial of her motion for leave to amend her complaint.  She claims that because her first two complaints were filed *pro se*, she should have been given the benefit of filing a complaint drafted by competent legal counsel.  While the district court denied leave to amend, it explicitly considered O'Daniel's proposed second

No. 18-30136

O'Daniel claims in essence that she was retaliated against because she "opposed" discrimination perpetrated against her on the basis of her heterosexual orientation. The propositions she and the amici advocate would require us to press beyond limits firmly established in the statute and our case law. Therefore, regardless of the "evolution" in other courts' decisions or the parties' preferred policy positions, we affirm the magistrate judge's straightforward approach.

Title VII outlaws employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Sex" discrimination has been held to encompass discrimination based on sexual harassment or sexual stereotyping. *See, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367 (1993); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989); *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444 (5th Cir. 2013) (en banc). But "Title VII in plain terms does not cover 'sexual orientation.'" *Brandon v. Sage Corp.*, 808 F.3d 266, 270 n.2 (5th Cir. 2015); *see also Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 330 (5th Cir. 2019); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) (per curiam) ("Discharge for homosexuality is not prohibited by Title VII . . . .").[11] Other circuits have recognized the Fifth Circuit's unequivocal stance barring Title VII coverage of

---

amended complaint in declaring the amendment would be futile. As a result, O'Daniel did in fact receive the benefit of a counseled complaint—the district court simply found that the counseled complaint also failed to state a claim upon which relief could be granted. We apply the same standard to the motion to amend as in reviewing the district court's decision on a motion to dismiss. *See Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (applying *de novo* standard identical in practice to standard used for reviewing motion to dismiss for failure to state a claim). And footnotes to this opinion indicate the minor changes effected by the proposed amendment. For the same reasons stated above, the district court properly denied O'Daniel leave to amend.

[11] *See also Stewart v. BrownGreer, P.L.C.*, 655 F. App'x. 1029, 1031 n.3 (5th Cir. 2016) (per curiam), which despite its being a nonprecedential, unpublished opinion is cited here to reflect the consistency of our decisions.

"sexual orientation" as a protected class. *See, e.g.*, *Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1255–57 (11th Cir. 2017) (citing decisions). Declining to consider the statute to cover a category of people not squarely identified by Congress in 1964 or even linguistically encompassed today by the applicable language, see Judge Ho's concurrence in *Wittmer*, 915 F.3d at 333–41, is thus a matter of precedent, otherwise known as our rule of orderliness. Because the law in this circuit is clear, we cannot accept O'Daniel's or the amici's suggestions that this panel either overrule the precedents or assume arguendo that the "trend" has upended them.

Title VII prohibits an employer from retaliating against an employee who engages in protected activity by "oppos[ing] any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a) (the "opposition" clause, *EEOC v. Rite-Way Serv., Inc,* 819 F.3d 235, 239 (5th Cir. 2016)). The threshold criterion for relief under this provision is a showing that the plaintiff "participated in an activity protected under the statute." *Feist v. La.*, 730 F.3d 450, 454 (5th Cir. 2013); *see also* Fifth Circuit Pattern Jury Instruction 11.5 (Civil Cases). As this court has explained, "the relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Yount v. S&A Restaurant Corp.*, 226 F.3d 641 (Table), 2000 WL 1029010, at *3 (5th Cir. 2000) (per curiam) (internal quotation marks, citation, and emphases omitted). There is no dispute here that O'Daniel advised Huber and Simoneaux on several occasions of her intent to file some kind of discrimination complaint against PNP for the

treatment meted out on her.[12]  But her allegations of protected conduct had to be "reasonable," that is, undergirded by charges that were, or reasonably appeared to be violative of Title VII.  In the face of our unbroken and unequivocal precedents, it is not "reasonable" in the Fifth Circuit to infer that Title VII embraces an entirely new category of persons protected for their sexual orientation.

This court has generously interpreted the scope of the "opposition" basis for retaliation.  *See, e.g.*, *EEOC v. Rite-Way Serv., Inc.*, 819 F.3d 235 (5th Cir. 2016).  In *Rite-Way*, for instance, the court determined that a plaintiff might have been disciplined for her "opposition" to workplace sexual harassment of another female employee by a male supervisor.  In so doing, we recognized that as to claims of sexual harassment, there is a "gray area between actual violation and perceived violation" in which a reasonable but mistaken belief may be held.  *Id.* at 242.  The court went on to explain that the nature of the comments, conduct, context and extrinsic features at the workplace all play a role in assessing actionable sexual harassment.  *Id.* at 243–44.[13]

Here, however, the question is not the potential scope of "sex harassment" prohibited by Title VII for over thirty years, it is the exclusion altogether of "sexual orientation" from the term "sex" in the statute.  O'Daniel's and the amici's arguments claim it is "reasonable" to assume that the law is not what it is.  In fact, as PNP acutely observes, they claim it is "reasonable"

---

[12] That she pursued an EEOC complaint after being fired is irrelevant to a claim of retaliation while still employed by PNP.

[13] This reasonable-belief interpretation has not been free from criticism.  This court has recognized that its approach "is in tension with the plain text of the statute, which appears to require that the employer's practice *actually be unlawful* under Title VII."  *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013).  If this court were to reconsider en banc its longstanding interpretation of "sex," it should also reconsider the reasonable-belief approach to retaliation.

for O'Daniel to be knowledgeable about the "uncertain" state of federal law throughout the circuit courts about the coverage of sexual orientation in Title VII, but ignorant about what this court has held. Those positions are untenable. A court could not award damages for Title VII "retaliation" on a plaintiff's claim that he reasonably "opposed" nepotism, unfair though the nepotism might be, if the nepotism had nothing to do with the statutorily protected classes. EEOC elsewhere admitted this condition of a retaliation claim:

> [T]he EEOC recognizes that the opposed conduct must have something to do with Title VII in order to support a retaliation claim. We do not understand it to be arguing, for example, that an employee who believes she was fired for making statements about accounting fraud in response to an internal investigation would be able to bring a Title VII retaliation case.

*Rite-Way*, 819 F.3d at 242. The scope of this provision, in sum, is dictated by the scope of Title VII's prohibitions, not by freestanding conceptions of "retaliation" or "opposition." Title VII protects an employee only from "retaliation for complaining about the types of discrimination it prohibits." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). O'Daniel's retaliation claim fails as a matter of law.

### B.    Freedom of Expression Claim under Louisiana Constitution Article 1, Section 7

The district court dismissed O'Daniel's freedom of expression claim on the ground that none of the Defendants were state actors and therefore they were not covered by the restrictions of Article 1, § 7 of the Louisiana constitution. Article 1, § 7 states:

> No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.

No. 18-30136

La. Const. Ann. Art. I, § 7.  The Louisiana Supreme Court has said that the state constitution's guarantee of freedom of expression "was designed to serve the same purpose and provides at least coextensive protection" as the First Amendment.  *State v. Franzone*, 384 So. 2d 409, 411 (La. 1980).  "The most basic of those [First Amendment] principles is this: '[A]s a general matter, . . . *government* has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Brown v. Entm't Merchants Ass'n,* 564 U.S. 786, 790–91, 131 S. Ct. 2729, 2733 (2011) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 1707 (2002)) (emphasis added).

O'Daniel attempts to side-step this limitation by arguing that it is "unsettled law" whether Article 1, § 7 covers conduct by private individuals or entities.  She cites one Louisiana court of appeals case that could possibly be construed to support her assertion:  *Wusthoff v. Bally's Casino Lakeshore Resort, Inc.*, 709 So. 2d 913 (La. App. 4 Cir. 1998).  In *Wusthoff*, the court stated in dicta, "An employee cannot be terminated because of race, sex, or religious beliefs or because he/she exercised constitutionally protected rights such as free speech."  *Id*. at 914.  She suggests that this language, combined with several cases stating that Article 1, § 7 *may* provide broader protection than the First Amendment in certain instances (none of which are relevant to this case),[14] somehow implies that a *private* employer might be liable for actions taken based on an employee's speech.  O'Daniel's argument is unpersuasive.

---

[14] *See generally, Mashburn v. Collin*, 355 So. 2d 879, 891–92 (La. 1977) (discussing free speech and freedom of the press in the *defamation* context); *Guidry v. Roberts*, 335 So. 2d 438, 448 (La. 1976) (discussing protections *against governmental power* in the campaign finance context); *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1389–90 (La. 1979) (discussing individuals' right to privacy under Article 1, § 5 of the Louisiana constitution as weighed against the freedom of the press); *Ieyoub v. Ben Bagert for Atty. Gen. Committee, Inc.*, 590 So. 2d 572, 573 (La. 1991) (Dennis, J., concurring) (stating the Louisiana

12

A more recent Louisiana Supreme Court case, as well as the language of Article 1, § 7 itself, clearly controvert O'Daniel's argument. In *Quebedeaux*, the Louisiana Supreme Court held that an employer is generally "at liberty to dismiss an employee at any time for any reason," and "[a]side from the federal and state statutory exceptions, there are no broad policy considerations creating exceptions to employment at will and affecting relations between employer and employee." *Quebedeaux v. Dow Chem. Co.*, 820 So. 2d 542, 545–46 (La. 2002) (internal quotation marks and citations omitted). This language does not expand the reach of Article 1, § 7 to private entities, and instead focuses on the limited statutory exceptions to Louisiana's at-will employment framework.[15]  While the Louisiana constitution may extend broader protections for speech than the First Amendment, it does so only as to state actors. O'Daniel's complaint failed to state a claim for a violation of freedom of expression under Article 1, § 7 of the Louisiana constitution. The court correctly dismissed this claim and committed no error in refusing to permit amendment on the basis of futility.

## CONCLUSION

For the above-stated reasons, the judgment of dismissal is **AFFIRMED**.

---

constitution "affords an even more complete safeguard against such a prior restraint of protected speech *in a political campaign*") (emphasis added).

[15] The law review note cited by O'Daniel also does not strengthen her argument, and even undermines it to some extent. *See* Mindy L. McNew, *Moresi: Protecting Individual Rights Through the Louisiana Constitution*, 53 La. L. Rev. 1641 (1993). The note discusses the Louisiana Supreme Court case of *Moresi*, and expounds upon the single phrase in *Moresi* that Article 1, § 5 (not § 7) of the Louisiana constitution does not include the expression "no law shall," which "indicate[s] that its protections reach far beyond limiting only state action." *Id.* at 1651 (citing *Moresi v. Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092 (La.1990)). The note states: "It can be argued that the language 'no law shall' indicates restrictions on the state. If such language is violated, the state is the focus of corrective measures." *Id.* at 1650. Unfortunately for O'Daniel, Article 1, § 7 explicitly includes the language "no law shall."

HAYNES, Circuit Judge, concurring in part and concurring in the judgment:

I join Section III.B of the majority opinion, which addresses O'Daniel's claim under the Louisiana Constitution, in full. I also concur with the judgment of the majority opinion, which affirms the district court's dismissal of O'Daniel's complaint under FED. R. CIV. P. 12(b)(6) for failure to state a cognizable claim under Title VII. However, I would not reach the issues that the majority opinion addresses in Section III.A. Instead, I would dismiss O'Daniel's complaint because even if all the factual allegations in her complaint are accepted as true, there is no reasonable inference that she was fired for any reason other than her Facebook post. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).

O'Daniel's complaint sets out a set of facts that demonstrate that her post ultimately led to her dismissal, a point she admits. It also states the Facebook post may have been in poor taste and politically incorrect. The complaint further admits that she was friends with Huber until Huber learned of the post. Other than her repeated statements that she was discriminated against because of her sexual orientation as a heterosexual, she points to zero facts supporting a conclusion that such was the case. *See Grimes v. Tex. Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996) (citing *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994)) (holding that an employee's subjective belief that discrimination occurred, by itself, is insufficient to support a jury verdict in plaintiff's favor). Thus, she has no facts to support a claim of such discrimination, even if it were protected, and, in turn, no reasonable basis or belief to claim retaliation. *Cf.*

No. 18-30136

*Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981).[1]

The question is not whether people are entitled to disagree (rudely or politely) about sensitive issues.  The question is whether O'Daniel has stated a claim under Title VII.  Simply put, Title VII does not grant employees the right to make online rants about gender identity with impunity.  I would stop there.

---

[1]  I agree with the majority opinion's concern about the "reasonable belief" standard, but it does not matter here:  without any facts to support a discrimination claim there is nothing to support a *reasonable* belief.